United States District Court
Southern District of Texas
**ENTERED**
March 09, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JON PAUL MARSH, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION No. H-14-2801 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner, a state inmate represented by counsel, files this section 2254 habeas petition challenging his conviction and seventy-year sentence for murder. Respondent filed a motion for summary judgment (Docket Entry No. 9), to which petitioner filed a response (Docket Entry No. 15).

Based on consideration of the pleadings, the motion and response, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment, **DENIES** habeas relief, and **DISMISSES** this lawsuit for the reasons that follow.

## I.  PROCEDURAL BACKGROUND

A jury found petitioner guilty of murder and assessed punishment at seventy years' imprisonment. The Fourteenth District Court of Appeals affirmed the judgment in *Marsh v. State*, 140 S.W.3d 901 (Tex. App. – Houston [14th Dist.] 2004, pet. denied). Petitioner's first application for state habeas relief was dismissed as non-compliant. His second application for state habeas relief was denied on the merits.

Petitioner raises claims for ineffective assistance of trial counsel, and argues that counsel was deficient in the following particulars:

1.  Counsel gave petitioner's expert psychiatric witness an erroneous legal definition of insanity.

2.  Counsel failed to object to the State's improper jury argument at the punishment phase of trial.

3.  Counsel failed to provide an adequate mitigation defense.

Respondent argues that these claims are without merit and should be denied. Respondent also argues that the petition is barred by the applicable one-year statute of limitations. The Court has carefully considered the persuasive arguments presented by petitioner and respondent, and is of the opinion that summary judgment cannot be entered on the basis of limitations. Therefore, the Court will address the merits of petitioner's habeas claims.

## II.  FACTUAL BACKGROUND

The intermediate state court of appeals set forth the following statement of facts in its opinion affirming petitioner's conviction:

On March 20, 2001, appellant, sixteen years old at the time, murdered his friend and neighbor, Nathan Mayoral, by hitting him in the head with a hammer and a clay pot. Appellant placed a plastic bag over Mayoral's head, wrapped his body in a sheet, and secured the wrapping with duct tape and postal tape. Appellant loaded Mayoral's body, backpack, and coat into his vehicle. He then threw Mayoral's body into a ditch, covering it with a piece of plywood, and disposed of the backpack and coat in a storm drain. Mayoral's body was discovered nine days later.

Detectives Alex Ortiz and Allen Beall, with the Harris County Sheriff's Department Homicide Division, were assigned to investigate the murder. The detectives received information that Mayoral had been in a homosexual relationship with appellant. Beall provided a set of appellant's fingerprints, already on file with the Sheriff's Department, to the crime scene unit processing the physical evidence. Appellant's fingerprints matched those prints found on the tape wrapped around Mayoral's body. The detectives used this information to obtain a probable cause warrant from the Harris County District Attorney's Office on March 31, 2001. Subsequently, the detectives attempted to arrest appellant at his place of employment, but were unsuccessful. They set up surveillance at his residence on the evening of April 1. While there, the detectives observed appellant leave his home, accompanied by his brother, in a Jeep. A patrol unit stopped the Jeep and an officer escorted appellant to a car where Beall was waiting. Beall advised appellant that he and Ortiz were with the Sheriff's Department and were conducting an investigation into Mayoral's murder. They asked appellant to accompany them to their office and discuss the case. Appellant stated he would be willing to talk with them, but did not know any more than what he had heard. At 7:04 p.m. that evening, the detectives transported appellant to a juvenile processing center at 333 Lockwood, the Precinct 6 Constable's office.

Appellant's brother, driving his Jeep, followed the detectives for a short time, but was stopped by another detective, Russell Coleman. Beall had instructed Coleman to stop the Jeep and explain to appellant's brother that appellant was in the custody of the Sheriff's Department for the murder of Mayoral. Beall also instructed Coleman to go to appellant's home and advise his parents that he was in custody. After arriving at appellant's home, Coleman testified he informed appellant's parents that "some new information had [come] up in the investigation of the death of Nathan Mayoral and that at that time we had a court order and we were detaining their son for the investigation." Further, Coleman testified he informed appellant's parents that Beall was the lead detective and provided them with Beall's phone number and his office address at 601 Lockwood.

In the meantime, while en route to the juvenile processing office and before any questions were asked of appellant, Ortiz read appellant his juvenile statutory warnings. According to the detectives, appellant was not restrained in any way and, although they were carrying their weapons, they were never used or exhibited to appellant. They arrived at the juvenile processing office

3

at 7:57 p.m. and began interviewing appellant at 8:10 p.m. The detectives spoke with appellant regarding his relationship with Mayoral and confronted him with the fact that his fingerprints were located on the tape found on Mayoral's body. At about 9:25 p.m., appellant told the detectives he and Mayoral were involved in a consensual homosexual relationship. Appellant stated he felt the homosexual relationship was an "abomination" and wanted to end it, but could not help himself when he was with Mayoral. He stated he had decided the only way to end the relationship was to kill Mayoral. Appellant also gave Beall specific information about the murder, including the location of the tape and hammer used, the presence of a sheet in his home similar to the one found on Mayoral's body, and the location of Mayoral's tennis shoes, backpack, and coat. Beall testified that these items were subsequently recovered from the areas identified by appellant. During this time, appellant did not indicate that he wanted to speak to his parents or a lawyer. The detectives did not threaten or intimidate appellant or promise him any benefits in exchange for his cooperation.

After providing this statement, appellant expressed a willingness to make a written or recorded statement. Appellant was then taken to a magistrate's office. At 10:40 p.m., appellant met with the magistrate and was admonished of his rights. Appellant indicated he understood those rights, initialed them, and the magistrate found that appellant knowingly, voluntarily and intelligently waived his rights. At 11:03 p.m., Beall and Ortiz interviewed appellant and recorded his statement. At the beginning of the interview, appellant stated he understood the legal warnings he had received and was willing to talk with them again and tell them what had happened. Appellant stated the same facts as in his unrecorded statement, providing explicit details of the crime. The interview was concluded at 11:30 p.m.

*Marsh*, 140 S.W.3d at 903–05 (footnotes omitted).

### III. THE APPLICABLE LEGAL STANDARDS

A.    Habeas Review

This petition is governed by the applicable provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254. Under the AEDPA,

federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court

4

unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view

5

that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.*, at 102–03 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

B.     Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 687. The failure to demonstrate deficient performance or prejudice is fatal to a *Strickland* claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance

7

was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor

of finding that trial counsel rendered adequate assistance and that the challenged conduct was

the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996).

To overcome this presumption, a petitioner must identify the acts or omissions of counsel

that are alleged not to have been the result of reasonable professional judgment. *Wilkerson*

*v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if

professionally unreasonable, does not warrant setting aside the judgment of a criminal

proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that,

but for counsel's unprofessional error, the result of the proceeding would have been different.

*Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient

performance renders the result of the trial unreliable or the proceeding fundamentally unfair.

*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness

does not result if the ineffectiveness does not deprive the petitioner of any substantive or

procedural right to which he is entitled. *Id.*

The Supreme Court recently emphasized in *Richter* the manner in which a federal

court is to consider an ineffective assistance of counsel claim raised in a habeas petition

subject to AEDPA's limitations:

> The pivotal question is whether the state court's application of the *Strickland*
> standard was unreasonable. This is different from asking whether defense
> counsel's performance fell below *Strickland*'s standard. Were that the inquiry,
> the analysis would be no different than if, for example, this Court were

adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (internal quotation omitted).

Petitioner raises the following three claims of ineffective assistance of trial counsel.

A.    Legal Definition of Insanity

Petitioner complains that counsel provided his expert psychiatric witness an erroneous legal definition of insanity, one that included the phrase, "or was incapable of conforming his conduct to the requirements of the law he allegedly violated." He argues that this error was detrimental to his trial because his defense had been based solely on the affirmative defense of insanity due to involuntary intoxication caused by the prescription medication, Paxil.

In rejecting this claim on state collateral review, the state trial court made the following relevant findings of fact:

14.    At trial, from voir dire to opening statement, through the presentation of evidence at the guilt phase, and in final argument, defense counsel never contested the fact that the applicant killed the complainant. As defense to criminal responsibility for the offense of murder, the defense of temporary insanity as a result of involuntary intoxication was interposed by trial counsel[.] At the time of trial (and at the time of the conduct charged), § 8.01 of the Penal Code provided: "[i]t is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."

9

15.  The definition of insanity urged by defense counsel in their memorandum of law and at the pretrial hearing conducted prior to the commencement of voir dire, as well as the jury charge conference at the close of the evidence at the guilt-innocence phase, erroneously enlarged the statutory standard to include the phraseology "or was incapable of conforming his conduct to the requirements of the law he allegedly violated," which was in effect in Texas from 1974 to 1983.

16.  In November of 2000, the applicant saw Gerald Ford, a psychotherapist, but was ultimately seen again by Jeff Williams until he was referred to Dr. Woodham, who saw him for the first time on February 6, 2001. On that date, the applicant was prescribed Risperdal and Paxil. Approximately three weeks later, on February 26, 2001, the applicant had a follow-up visit with Dr. Woodham, who took him off of the Risperdal but increased the dosage of Paxil – doubling it from 20 milligrams per day to 40 milligrams per day. Ms. Betty Marsh, the applicant's mother, witnessed her son take the medications as prescribed.

17.  In February and March of 2001, Ms. Marsh noticed a change in her son's personality and behavior: he became "very negative, agitated and nervous" and was "very hostile" toward both Ms. Marsh and her husband, Jon Marsh.

18.  After the applicant's arrest, he began seeing a new psychiatrist, Dr. Edwin Johnstone, who took him off of the Paxil and prescribed Neurontin and Zebeta. Once the Paxil was discontinued, Ms. Marsh testified that the applicant was "the same as he was before he started taking the Paxil."

19.  Dr. Johnstone reviewed the medical records of Dr. Woodham which indicated that the applicant had been prescribed Risperdal for psychosis and Paxil for depression; Dr. Woodham's diagnostic impression for the applicant was "depression with psychosis." Dr. Johnstone disagreed with this diagnosis and was of the opinion that it was incomplete and inaccurate. He did not believe that the applicant was depressed and because of the applicant's anxiousness, he would not tolerate Paxil well and would be "much more prone to have bad side effects." Dr. Johnstone also was of the opinion that the dosage for Paxil was too high. As Dr. Johnstone testified, "if a person is not depressed, they're

[*sic*] likelihood of having a bad side effect is even higher than it is in people who are depressed, and if he's anxious, then it's especially high."

20.     Dr. Johnstone testified that, while the applicant had "a defined sense of right and wrong," the ingestion of Paxil "brought about a modification in his personality so that his capacity to distinguish between right and wrong was diminished."

21.     The State established on cross-examination that Dr. Johnstone was not a forensic psychiatrist and had no other patients with pending criminal charges. He conceded that he infrequently evaluated individuals who were not his patients as to the issue of insanity.

22.     He did not make himself familiar with Texas law as to the issue of insanity prior to his testimony. He did not prepare a written evaluation regarding sanity/insanity in this case but did write a letter dated March 20, 2002 which contained a summary of his involvement and impressions which he sent to Dr. Jerome Brown, a practicing forensic psychologist and to Dr. Edward Friedman, a psychologist employed with the Harris County Mental Health and Mental Retardation Authority, both of whom testified on behalf of the State. Dr. Johnstone conceded that at the time he wrote the letters he believed "[t]hat insanity meant either not knowing right from wrong, or if you did not know right from wrong, not being able to conform your behavior to what you knew to be right."

23.     Dr. Johnstone agreed with the State that the applicant did not suffer from hallucinations at the time of the commission of the offense and did not receive suggestions "that what he was doing was right." Although he testified that Paxil diminished the applicant's ability to "know right from wrong," he conceded that had the applicant's mother been standing in the backyard watching him during the killing of the complainant, the applicant "would have known he could get in trouble."

\*    \*    \*    \*

47.     The applicant's mother, Betty Marsh, testified that on February 6, 2001, Doctor Woodham, a psychiatrist, prescribed Paxil and Risperdal for the

applicant. She obtained the medications and made the applicant take them.

57.   Ms. Marsh said she would remind the applicant to take the medicine and would check to make sure he had. She saw him take his medicine in February 2001. Mrs. Marsh testified that on February 26, at a follow-up visit, Dr. Woodham took applicant off Risperdal and doubled his dosage of Paxil to 40 milligrams.

58.   Ms. Marsh described various changes she observed in applicant's behavior after the medication change and said that Dr. Edwin Johnstone, another psychiatrist, stopped the applicant's medication with Paxil in July 2001. The prosecutor asked Mrs. Marsh, "So to this day you don't know why he [the applicant] killed him [the complainant], do you?" She answered, "I know why he did it. Because he was on Paxil."

59.   Edwin Johnstone, M.D., a psychiatrist, testified that he took over the applicant's psychiatric care in July 2001, and took the applicant off of Paxil. Johnstone reviewed Dr. Woodham's records, and he disagreed both with Woodham's diagnosis and his decision to put the applicant on Paxil.

60.   Johnstone opined that Paxil brought about a modification of applicant's personality that diminished his capacity to distinguish right from wrong, and essentially said that Paxil caused applicant to have a mental defect in connection with the homicide that prevented him from knowing what he was doing at the time of the killing was wrong. Johnstone was of the viewpoint that applicant should be excused from his crime because he was under the effects of Paxil.

61.   Johnstone, who had reviewed applicant's statements to the police, testified during cross-examination by the State that he took detailed notes concerning what applicant told him about the homicide, testified to the contents of the notes, and said applicant essentially told him the same things that he told the police about the complainant's death.

62.   The State offered various evidence in rebuttal to the applicant's defense, including the testimony of William Day, a neighbor of the applicant, and psychiatric and psychological, experts Robert Woodham, M.D., Jerome Brown, and Edward Friedman.

63.    Woodham, the psychiatrist who prescribed Paxil for applicant, testified that it was extremely safe for treatment of depression or anxiety in adults and adolescents, that it would cause no adverse effects, and that there were no reports anywhere in medical or scientific literature that the drug caused violent or homicidal behavior.

64.    Jerome Brown, a clinical psychologist, reviewed relevant records, including the offense reports and applicant's statements and met and examined the applicant. He testified that the applicant's murder of the complainant was purposeful and intentional. Brown also related various details that the applicant had told him about the killing and his efforts to dispose of the complainant's body. Brown opined further that the applicant was not mentally ill at the time of the offense and knew what he did was illegal, unacceptable, and should not be done. In Brown's opinion, the killing was not the act of an insane person. Edward Friedman, a psychologist who examined applicant at the request of the trial court, testified that in his opinion applicant was competent and sane.

*Ex parte Marsh*, at 202–204, 209–211 (record and case citations omitted).

The state trial court further made the following relevant conclusions of law:

65.    Based on the credible testimony of [trial counsel] and its review of the record, the Court finds that the applicant faced an extremely strong case from the State.

66.    The Court finds, based on the credible testimony of [trial counsel], that [trial counsel and co-counsel] spent months discussing the best strategy for addressing the mental state of the defendant at the time he committed the murder.

67.    The Court finds, based on the credible testimony of [trial counsel], that when the applicant's attorneys sought a definition of temporary insanity as a result of involuntary intoxication that differed from the legally applicable one, they were deliberately attempting to get the most favorable possible charge for their client.

68.   The Court finds, based on the credible testimony of [trial counsel], that [counsels'] decision to do so reflected their reasonable professional belief that no other defensive strategy could better serve their client.

69.   The Court finds, based on the credible testimony of [trial counsel] and its review of the record, that the applicant's choice to seek such a definition was the product of a reasonable trial strategy and fell within reasonable professional norms.

70.   The Court finds, based on the credible testimony of [trial counsel] and its review of the record, that, even if the applicant's decision to seek an instruction was deficient, it had no impact on the outcome of the trial. Virtually all of the evidence and testimony supported the conclusion that the applicant could distinguish right from wrong at the time he committed the murder.

*Ex parte Marsh*, at 211–212. The Texas Court of Criminal Appeals relied on these findings

of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

The state trial court held a hearing on collateral review, during which trial counsel

explained his trial strategy for defending petitioner, as follows:

Q:   And essentially, the argument you were making is that as a result of the involuntary intoxication, that he should be excused for his conduct, either because he did not know it was wrong or he was incapable in performing [*sic*] his conduct under the requirements of the law?

A:   Right. We were asking for that definition based on the particular facts of Mr. Marsh's case, believing that was the only way we would have any attempt to prevail on an insanity issue if we could get a charge on the broader definition of insanity.

Q:   To make clear, you realize that the [standard] insanity defense was not going to get you there with the broader approach that you needed?

A:   Unfortunately, because the Defendant gave a statement explaining, you know, why he did what he did, you know, and the steps that he took to cover up the murder and the fact that the body in this case – that the Defendant took,

14

went to great lengths to – I guess you can argue that the victim was lured into the home at a time there were no witnesses; that there was some premedi[t]ation involved; that the body was then wrapped in, I think, sheet and some plastic and duct tape and taken to a remote location and dumped.

*    *    *    *

A:    It became apparent, at least from Dr. Johnstone, the facts of the case, the statements of the Defendant himself, that he was not going to be able to support a – the [standard] definition of insanity. He could not say based on that very narrow insanity definition he was not going to be able to support that and say that Mr. Marsh was insane at the time of the offense. Therefore, we needed to look for an alternative in an attempt – and because of the Paxil issue, which I still believe is legitimate, we needed a vehicle to provide psychiatric testimony, to get the Paxil issue in front of the jury, because we believe that the Paxil given, that he was being prescribed the Paxil, that he was a juvenile, the issue involving Paxil, and his age was important, we thought that we were going to push the issue with temporary insanity with that definition at trial.

*Ex parte Marsh*, Habeas Hearing, pp. 10–12, 25 (emphasis added).

Petitioner argues that it was not strategically sound or within reasonable professional norms to pursue a legal defense which, as a matter of law, was clearly not recognized or applicable at the time of trial. The state trial court, however, determined that the decision was the product of a reasonable trial strategy and fell within reasonable professional norms. The state trial court further determined that the strategy reflected counsel's reasonable professional belief that no other defensive strategy could better serve petitioner. In short, the trial court concluded counsel was not deficient. The state trial court also concluded that petitioner was not prejudiced, in that virtually all of the evidence and testimony supported the conclusion that petitioner could distinguish right from wrong at the time he committed the murder.

15

The state court record clearly evinces that trial counsel's strategy was reasonable, and that the state court properly determined that petitioner's defense attorney did not provide ineffective assistance of counsel in this regard.  Petitioner does not establish that, but for counsel's use of an allegedly improper definition of insanity, there is a reasonable probability that the result of the trial would have been different.  Nor does petitioner posit a viable alternate trial defense supported by the record.  Petitioner fails to establish deficient performance and actual prejudice.

The state court on collateral review denied petitioner's claim for ineffective assistance of counsel.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of this claim.

B.    Improper Jury Argument

Petitioner next claims that trial counsel failed to object to the State's improper jury argument at the punishment phase of trial.  Petitioner directs the Court to the following portion of the State's closing argument during the punishment phase of trial:

> [The State]:  This was a murder case that was done in hate.  This was a murder case that was generated from deep in the dark recesses of this man's soul.  And I'm sorry that he has a soul that is as black as pitch of night.  And I'm sorry if his mama and his daddy did that to him, and certainly you wouldn't punish him for their sins.  You're going to punish him for his sin.  And it offends me that counsel would get up here and blame everybody else in the room:  The mom and the dad, who footed the expense for this trial.

Everybody is at fault. Paxil is at fault. This defendant has not accepted one ounce of responsibility for the death of this beautiful young child.

[Defense Counsel]: I object to that, Your Honor. If we could approach on that issue.

[Trial Court]: No, sir. It's overruled.

[The State]: Not one bit of responsibility. He's regretful, yes. He's regretful because he didn't expect to get caught and he did. But remorseful? No. Is there remorse anywhere for anything other than the fact that he got caught?

13 R.R., pp. 18–19.

Petitioner argues that trial counsel was ineffective in this instance in failing to preserve error with only a general objection, and in failing to object when the State commented on petitioner's lack of remorse. He contends that counsel should have specifically objected that the State was improperly commenting on petitioner's decision not to testify.

In rejecting this claim on state collateral review, the state trial court made the following relevant findings of fact:

71. The Court finds that [trial counsel] explained the difficulty he faced in deciding when to object during the closing argument.

72. The Court finds, based on the credible testimony of [trial counsel], that the applicant's attorneys reasonably perceived that the judge presiding over the trial was not ruling favorably on many of their objections.

73. The Court finds, based on the credible testimony of [trial counsel], that the attorneys were legitimately concerned that, if many of their objections were overruled, it would give the appearance that the court sanctioned otherwise objectionable things.

74.   The Court finds, based on the credible testimony of [trial counsel] and its review of the record that, even if the applicant's attorney's failure to object to certain statements made by the prosecutor during his closing argument during the guilt innocence phase constituted deficient conduct, there is no likelihood that these failures impacted the outcome of the trial.  The State's case was overwhelming, and the applicant's evidence regarding his mental state at the time of the murder was unpersuasive.

75.   The Court finds that, although the applicant claims that [trial counsel's] objection was insufficient to preserve error for direct appeal, the ground of [trial counsel's] objection, that the prosecutor was commenting on the applicant's failure to testify, was obvious to all from the context of the argument.  Error was therefore preserved.

76.   The Court finds that, while the applicant complains that [trial counsel] failed to object to what he characterizes as the prosecutor's appeal to community expectations in his closing argument on punishment, the applicant nevertheless fails to prove that his attorney's conduct was deficient.

77.   The Court finds that [trial counsel] credibly explained his overall approach to objecting during the prosecutor's closing argument. The Court notes that, as [trial counsel] described, immediately after the argument relating to community expectations, the trial court sustained his objection that the prosecutor was arguing outside the record. Further, the court immediately overruled the same objection to virtually the same kind of argument.

78.   Based on the record and [trial counsel's] credible testimony, the Court finds that the applicant's attorney was attempting to walk a line between objecting "too much" and "not enough." The Court further finds that the applicant's attorney objected to the extent he deemed proper given the attitude of the court during the entire trial. The Court finds that the applicant's attorneys were legitimately concerned with the possibility that a decision overruling their objection could highlight and tend to give credibility to the prosecutor's argument.

79.    The Court finds that, subsequently, [trial counsel] did successfully object to the prosecutor's argument, obtain an instruction to disregard, and move for a mistrial.

80.    Based on Counsel's overall performance during the prosecution's closing arguments, the Court finds that the applicant fails to prove that his attorney's conduct was deficient.

81.    Based on its review of the record, the Court finds that, even if the applicant's counsel were deficient in failing to object to certain arguments; the applicant nevertheless fails to prove that the outcome of the trial would have changed but for his attorney's actions. The Court concludes that the jury assessed punishment at 70 years confinement because of the extreme brutality of and circumstances surrounding the crime.

*Ex parte Marsh*, at 213–214 (record, case citations omitted).  The Texas Court of Criminal Appeals relied on these findings of fact and/or conclusions of law in denying habeas relief. *Id.*, at cover.

The state trial court expressly found that, under the circumstances and in context of the closing argument, defense counsel's general objection was sufficient to preserve error as to the State's purported comment on petitioner's failure to testify.  This constituted an interpretation of state evidentiary law that is binding on this Court for purposes of habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006) (holding that a federal habeas court must defer to a state court's interpretation of state law); *Young v. Dretke*, 356 F.3d 616, 628 (5th

Cir. 2004) ("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."). Consequently, this Court cannot question the state court's finding that the objection was sufficient to preserve error. Because the objection was sufficient to preserve error, petitioner fails to establish either deficient performance or actual prejudice as to this particular issue.

The state trial court on collateral review further found that counsel's inaction in not objecting to the State's comments regarding lack of remorse was reasonable trial strategy under the circumstances. Specifically, the state trial court found that defense counsel were "legitimately concerned with the possibility that a decision overruling their objection could highlight and tend to give credibility to the prosecutor's argument." Having reviewed the state court record, this Court finds that the state court's findings were reasonable in light of counsel's reasoned trial strategy and the record as a whole.

The state court on collateral review denied petitioner's claim for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

C.    Mitigation Defense

Petitioner complains under this issue that trial counsel failed to provide an adequate mitigation defense, in that several mitigation witnesses were available, but were not called

20

to testify for the defense during punishment.  Petitioner states that the only witness called was his mother, who testified that petitioner had no prior felonies.

Petitioner argues that twenty-five witnesses were available and willing to testify in his behalf at the punishment hearing.  Defense counsel testified at the habeas hearing as follows:

> Q:     The Applicant has complained that there were punishment witnesses – I guess mitigation type witnesses that were available and willing to testify at the time that the punishment hearing was taking place.
>
> I guess my first question with respect to that claim is, whether you were aware of those witnesses?
>
> A:     Yes, we were.
>
> Q:     And obviously, you decided not to call them at punishment?
>
> A:     Myself and [co-counsel] discussed at length – after [petitioner] was found guilty, we discussed at length how we were going to handle punishment, whether we were going to call these witnesses that were in court ready to testify if need be.  We talked at length.  We struggled back and forth with the issue of what, if any, punishment witnesses could offer, given the fact that we had offered so much family background.
>
> His mother testified.  The psychiatrist testified and provided a lot of what normally would be information or testimony that would have come out with punishment, we got in guilt/innocence.  The thought process was that if we called additional witnesses, that the prosecutor, of course again and again, will be able to go through the horrific nature of the offense, you know, showing the pictures over and over again, bringing up, you know, obviously, the more aggravating details in front of the jury.
>
> And we made – we'd gone through a lot of that in guilt/innocence.  You know, our – we thought just looking at the jury and watching the jury, that the – we were as good as we can get as far as any mitigation that we could offer in the case.

Q:     I guess my last question is basically to summarize what you just said to make sure that I understand, your decision not to call those witnesses, you literally weighed the plus and minuses in consultation with your co-counsel; and that's the decision you came to based on everything that happened in the trial?

A:     Absolutely.  We discussed it with Paul Marsh the Defendant, the family. We discussed it, here is our thinking, our thought processes, whether to call witnesses, not call witnesses; and it came to the strategic decision not to.

*     *     *     *

Q:     You would agree with me that it's not a decision for the Defendant to make, certainly not a decision for mom and dad to make.  It's a decision for counsel to make?

A:     No, absolutely.  It was a decision that his lawyers made in this case. Obviously, we wanted the family to be informed of [our] thought process and what our thinking was; but ultimately, it was our decision.

Q:     Not only was it your decision; but the truth of the matter is, that there were people present in the courtroom at that stage of the proceeding that were ready, willing and able and probably expected that would be called; but ultimately they were not.  Fair statement?

A:     Fair statement.

*     *     *     *

Q:     And Paul had expressed remorse about the killing.  Fair statement?

A:     To other people or to me directly?

Q:     To other people.  Obviously, you would not be able to testify?

A:     I will – this conversation would have been 10 or 11 years ago.  I don't know – all I can tell you is that there were witnesses that certainly made themselves available to testify as to what Paul had told them. Honestly, I don't remember.

22

Q:     If I told you that part of my job has included talking with members of the Marsh family, talking to family, other family members and friends,  and that I have filed sworn affidavits attesting to their willingness and readiness to testify that Paul was remorseful, that he was a common kid, that his remorse was genuine, that he was respectful; that he was a loving child, that he had a gentle nature, he had a positive attitude, he had done good deeds, he was carrying [*sic*], he was trust worthy, he was not materialistic, he engaged in good conduct after being released on custody and that various parents have no problem having their kids come over during the time he was on house arrest and have them around Paul, would you dispute that that kind of testimony was out there, had you decided to put it on?

A:     And I guess my – our thought process was that these witnesses would come and say those things.  Obviously, all contrary to the brutal murder  he had been convicted of, you say that; and now, have you seen these photographs?  Are you aware of this?  And are you aware that he beat this young child to death?

And that's what we were trying to avoid, rehashing all that; and I understand what you're saying.  And I will defer to your affidavits, because certainly I have not had an opportunity to read through the appeal record, any of the writ filings because I was not aware of this hearing.

*Ex parte Marsh*, Habeas Hearing, pp. 13–18.

In rejecting petitioner's claim on state collateral review, the state trial court made the following relevant findings of fact:

82.     The Court finds based on the applicant's writ exhibits F, G, H, and I, that there were a significant number of witnesses who were available to testify during the punishment phase and could have provided information about the applicant's background and other "mitigating" information.

83.     Based on the credible testimony of [trial counsel], the Court finds that the applicant's attorneys were aware of these witnesses, knew that they were available to testify, and were familiar with the nature of the testimony they could offer.

84.   At the punishment phase, the only witness who was called by trial counsel for the applicant to testify on his behalf was the applicant's mother, Ms. Betty Marsh. She testified that the applicant had never before been convicted of a felony (and hence, was eligible for probation).

85.   Several character witnesses for the applicant were present at trial and would have testified had they been called to the witness stand as per the affidavits made part of the record. That testimony included good and bad behavior on the part of the applicant. Hearsay testimony of the applicant's remorsefulness was available from some of these witnesses, as well as testimony that some parents in the neighborhood were not reticent in allowing their children to visit the applicant at his family home while out on bond pending trial. During trial, the prosecution cross-examined the applicant's mother and Dr. Johnstone, establishing that the applicant had previously been arrested for shoplifting and trespassing while trying to obtain mushrooms to get high, had experimented with drugs, and had clocked in at a grocery store where he was employed but failed to perform his duties.

86.   Based on the credible testimony of [trial counsel], the Court finds that [counsel and co-counsel] struggled with the decision of whether or not to call these witnesses during the punishment phase.

87.   Based on the credible testimony of [trial counsel], the Court finds that the applicant's attorneys were legitimately concerned that, with each mitigating witness, the State would have an opportunity to cross-examine them and further highlight the extremely brutal nature of the crime.

88.   Based on the credible testimony of [trial counsel], The Court finds that [counsel and co-counsel] had observed the jury return to the courtroom, when they announced their verdict at guilt-innocence and believed the jury displayed some signs of sympathy toward the applicant.

89.   Based on the credible testimony of [trial counsel], the Court finds that [counsel and co-counsel] balanced the relative benefits and risks of calling the available punishment witnesses and made a strategic decision to refrain from calling them.

*Ex parte Marsh*, at 214–215.

When an ineffective assistance of counsel claim is subject to AEDPA review, "the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. As the Supreme Court has explained:

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, [529 U.S.] at 410. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* Thus, while "[s]urmounting *Strickland*'s high bar is never an easy task," "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 105 (citations omitted). Both the *Strickland* standard and the AEDPA standard are highly deferential and when the two apply together, review is "doubly so." *Id.*; *see also Trottie v. Stephens*, 720 F.3d 231, 241–42 (5th Cir. 2013). "When section 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

In the instant case, defense counsel set forth a sound and well-reasoned strategy for not presenting other defense witnesses at punishment. Where defense counsel's decision concerning which witnesses to place on the stand during the punishment phase reflects a

sound tactical strategy, a court will not find ineffective assistance of counsel. *See Boyle v. Johnson*, 93 F.3d 180, 187–88 (5th Cir. 1996); *see also Chamberlain v. Quarterman*, 239 F. App'x 21, 27 (5th Cir. 2007). The state trial court found counsel's trial strategy sound and reasonable under the circumstances of the case and, in turn, this Court finds that the state court's determination under *Strickland* was itself reasonable.

The state court on collateral review denied petitioner's claim for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

## V.  CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 18) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**. A certificate of appealability is **DENIED**. Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on _____ MAR 0 9 2016 _____.

_____
ALFRED H. BENNETT
UNITED STATES DISTRICT JUDGE